## STATE v RICKMAN

Ohio Appeals, 2nd Dist, Montgomery Co

No 1436.   Decided July 8, 1937

Nicholas F. Nolan, Prosecuting Attorney, Dayton, Sam D. Kelly, Asst. Prosecuting Attorney, Dayton, and C. W. Magsig, Asst. Prosecuting Attorney, Dayton, for plaintiff-appellee.

W. S. Rhotehamel. Dayton, Gale G. Murphy, Dayton, and Herbert M. Eikenbary, Dayton, for defendant-appellant.

## OPINION

By BARNES, PJ.

The above entitled cause is now being determined on defendant's appeal from the judgment of the Court of Common Pleas of Montgomery County, Ohio.

On June 9, 1936, the grand jury in and for Montgomery County, duly returned an indictment against the defendant, Charles Rickman, charging him with murder in the first degree. On June 11 following, the defendant entered a plea of not guilty. Trial started on June 22 and proceeded from day to day until June 30, upon which latter date the jury returned a verdict of guilty of murder in the first degree, as charged in the indictment, with a recommendation of mercy. Within three days motion for new trial was filed. On July 23 following same was overruled, and on same day defendant sentenced to the Ohio Penitentiary for life. On August 6 thereafter notice of appeal was filed.

Counsel for appellant set forth the following assignments of error:

"1. Irregularity in the proceedings of the jury.

"2. Irregularity of the witnesses for the State by which the defendant was prevented from having a fair trial.

"3. Misconduct of the jury.

"4. Misconduct of the witnesses for the State.

"5. Accident or surprise. which ordinary prudence could not have guarded against.

"6. Verdict is not sustained by sufficient evidence.

"7. Verdict is contrary to law.

"8. Misconduct of one of the members of the jury in his examination on his voir dire.

"9. Newly discovered evidence, material to the defendant, and which he could not with reasonable diligence have discovered and produced at the trial.

"10. Errors of law occurring at the trial.

"11. And for all other errors, defects and omissions apparent upon an inspection of the record, proceedings and original papers herein."

The brief of counsel for defendant discusses no other assignment of error than that the verdict was not sustained by sufficient evidence and is therefore contrary to law.

Under the recognized rule of procedure, we are under no·obligation to consider any other grounds of error than those presented in the brief. However, owing to the nature of this case and the very severe penalty imposed, we have very carefully and critically examined the record for the purpose of determining if prejudicial error is manifest.

We find nothing in the record supporting or even hinting at any irregularities as set out in assignments of error Nos. 1, 2, 3, 4, 5, 8 and 9.

Assignments Nos. 10 and 11 are very general and are not made specific through anything set forth in the brief of counsel. The record comprises some 540 pages of typewritten matter, and, ordinarily in a case of this moment consuming so, many days in the trial, would present some specific claimed errors in the introduction or rejection of evidence and in the court's general charge to the jury. After examining the record, we can very readily understand why no error is claimed as to the presentation or rejection of evidence. The trial court presided with great skill and learning, and, very correctly, the defendant was given· the benefit of all doubtful questions.

The charge of the court was a model, not only in its diction but also in correctness and clarity in stating the law.

The sole remaining question is under assignments of errors Nos. 6 and 7, as follows:

"6. Verdict is not sustained by sufficient evidence.

"7. Verdict is contrary to law."

The consideration and determination of these questions require a reading of the record. Every word of this 543 page record has been read and parts of it reread. The defendant, Rickman, took the stand in his own defense. He admitted the homicide, but claimed the killing was done in self defense. Under the law, the burden was upon the defendant to prove this defense by a preponderance of· the evidence, and the jury were so instructed. Notwithstanding the·plea of self defense, the burden is upon the State to prove all the elements of the crime charged beyond a rea-

sonable doubt, and on this principle of law the jury were correctly charged.

The homicide took place on the morning of June 5, 1936, near 9:30 A. M. The State in support of its claim of ▮▮▮ premeditation and deliberation, presented evidence that on the day previous the defendant purchased a .32 calibre revolver with five cartridges for the five revolving chambers. The purchase was made of a pawn broker. This seller of fire arms was required to keep a record of the name of the purchaser and his address. The defendant, when he made the purchase, gave an incorrect name and an incorrect address. When on the stand the defendant admitted all of these facts. In the evening of the same day that the revolver was purchased, the defendant, in company with a friend, went out to North Dayton to a place operated by Jim Traylor, where refreshments were served. The defendant and his friend entered this place from the alley and as they were proceeding up the walk they could hear singing from within. The defendant stopped, called his friend's attention to the singing and said: "That is him—Lloyd Bodine." (Bodine was the man shot by the defendant on the following day) The defendant then pulled from his pocket the revolver, which was wrapped up, unwrapped it, placed the same in his pocket and then proceeded into the back door of Jim Traylor's. Immediately upon entering the defendant inquired as to who was singing, and some stranger, slightly intoxicated, volunteered the information that he was doing the singing. Later Rickman and his friend went out and walked past the Bodine home, which was in that neighborhood. Very late that night, Rickman and his friend left the North Side and returned to their respective homes. These two men separated when they got back into the vicinity of their rooming places, the defendant going to his room and then to another location where his wife and children were living. The wife had recently brought an action for divorce against the defendant and had obtained orders for payment of temporary alimony. The defendant, Rickman, was impressed with the fact, and probably correctly so, that in years past Bodine had been unduly attentive to Rickman's wife. A great deal of evidence was introduced on behalf of the defendant as to these improper relations. The trial court at all times cautioned the jury that such evidence was not admissible as a defense, but only for the purpose of throwing light upon

the question of threats made by Bodine and the element of fear which the defendant, Rickman, claimed existed in his mind. The defendant, Rickman, claimed that he left the revolver in his room when he went over to the apartments of his wife late at night on the 4th of June. On the following morning Rickman requested his landlady to 'phone the superintendent of the ice plant where he was working that he was not able to come to work, but that he was going to a doctor to have his leg treated. The evidence supported the claim of Rickman that he had a running sore on his leg and had had for several months. He left his rooming house, taking the revolver with him, and again went out to North Dayton, this being the location of the home of Lloyd Bodine. It was the claim of Rickman that he was going out to see a Dr. Potts, who lives and has his office in this same locality. Rickman proceeded along the street upon which is located the office of Dr. Potts, but on the opposite side of the street. He proceeds a square or two, then crosses over and starts back. Within a few hundred feet Rickman and Bodine met. These movements of Rickman are presented only through his own testimony. No witnesses were presented who saw him in the vicinity that morning prior to the meeting with Bodine. A lady living across the street was called as a witness, who said that she was shaking her dust mop at the front porch when she heard a shot immediately followed by a second, and one man staggered out in the street and then back across the sidewalk, falling on the terrace with his head near the cement steps up to the residence. She then saw Rickman walk leisurely down the street and around the corner. She ejaculated to him that he had shot or killed a man, but he made no response. A driver of a truck, which he said made a lot of noise, was driving along this street and he gives testimony that this man who was shot staggered out into the street at the point, that he was fearful that he would hit him and had to swerve to the opposite side, but this man then staggered back in the other direction and fell on the terrace. This witness did not hear any shots and thought the man was drunk. A short distance down the street he stopped and as Rickman came along he asked him "What was the matter with that man, was he drunk?" Rickman answered "yes." Another witness who was driving on the street testifies that as he was passing, the two men had their arms extended and their hands

on each others shoulders; that he continued to look back and heard the shots. In the trial of the case Rickman testified that as he was walking down this street in the direction of Dr. Potts' office, and suddenly and unexpectedly saw Bodine approaching when they were scarcely two feet apart. That he gave a hello salutation and that Bodine returned the same. That he Rickman, said "Are you back?" and Bodine replied, "Yes, I came back to take your wife and children with me to West Virginia." That immediately following Bodine struck at him twice, first with his left hand and then with the right. Following the attempted assault he says that Bodine threw his right hand towards his rear hip pocket as he thought to get a gun, and thereupon he pulled his own gun out of his pocket and shot Bodine. He says he only remembers firing one shot. One of the bullets went through Bodine's heart; and the other bullet also entered the chest, but on the opposite side. The testimony of the coroner discloses that Bodine was not armed. Rickman, after the shooting, left the scene. He threw the revolver away and with it a shirt which he said he was taking to a laundry. At another location he took off and threw his coat away. He went to a store and purchased a new hat, new trousers and sweater. This was for the purpose of changing his appearance. He wandered around considerably, finally going to a cement bridge on the outskirts of the city. He left word at a filling station for the man in charge to have his sister come out to the bridge. The officers found him at this location, arrested him and he has been in custody ever since. An officer of the Police Department took his statement on the same night of his arrest, and an assistant prosecutor took his statement on the following morning. These statements, in some of their vital parts, are contradictory to Rickman's testimony on the stand. His explanation as to why he purchased the revolver is very damaging. In substance, he said he had in mind getting Bodine, if he, Bodine, didn't get him first. In one of the statements he also said he saw Bodine on the opposite side of the street before he crossed over.

The evidence presented by the defendant, Rickman, as to his being in fear of Bodine was not based on very convincing claims. None of his witnesses who gave evidence of the relation between Bodine and Rickman's wife, ever heard Bodine make any threats against Rickman, except two or three exceptions in which Rickman and Bodine had a quarrel. One instance was some five years previous; the second, possibly the second year and the third approximately a year before the homicide. The last instance had no support except Rickman himself. This instance was at the home of Bodine and three witnesses gave entirely different statements. On one occasion Bodine drove up in front of the Rickman home. Some witnesses say Mrs. Rickman was in the car with Bodine when he drove up; others that she went out to the car to talk with Bodine. Rickman went out to the car, took his wife by the arm and took her back into the house. At this time the evidence is presented that Bodine made some threatening remark as to what he would do if Rickman abused or struck his wife. The threat was of a very serious nature. The incident was closed by Bodine driving away. All of these instances were so far removed that the jury may have concluded that they were mere extravagant statements which often follow a quarrel, and by reason of that fact, together with the remoteness. could not be the basis of the fear arising in the mind of Rickman prompting him to purchase the revolver just the day previous to the homicide.

It can serve no useful purpose to narrate our analysis of the testimony of each and every witness. Suffice it to say that we have endeavored so to do with the greatest of care.

In a homicide of this character juries very frequently refuse to convict where there is present credible evidence that the slaying was probably prompted through intimacy of the deceased with the wife of the accused. This is true notwithstanding that trial courts clearly and correctly charge the jury that no man has a right to take the law into his own hands in the redress of his wrongs, no matter how serious they may be. The jury in the instant case very correctly failed to be influenced through this element of the case. The real issue of self defense was purely a question of fact. The jury resolved the facts against the claim of the defendant. The trial court trying the case through the motion for new trial had before him every question that is now presented to us for review. He saw and heard the witnesses and, like the jury was in more favorable position to pass on the credibility of the testimony than a reviewing court

We are constrained to the view that we must sustain the action of the trial court. Defendant's appeal will be dismissed and

the cause remanded for further proceedings according to law.

HORNBECK and GEIGER, JJ, concur.